**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| PARENTS DEFENDING EDUCATION, <br> *Plaintiff,* <br> v. <br><br> CROTON-HARMON UNION FREE SCHOOL DISTRICT; CROTON-HARMON BOARD OF EDUCATION; STEPHEN WALKER, in his official capacity as Superintendent of Croton-Harmon Union Free School District; JOHN GRIFFITHS, in his official capacity as Assistant Superintendent of Croton-Harmon Union Free School District; LAURA DUBAK, in her official capacity as President of Croton-Harmon High School; MARK MAXAM, in his official capacity as Acting Principal of Croton-Harmon High School; SARAH CARRIER, in her official capacity as President of Croton-Harmon Board of Education; NEAL HABER, in his official capacity as Vice President of Croton-Harmon Board of Education; and ANAMIKA BHATNAGAR, ANA TEAGUE, JOSHUA DIAMOND, OMAR MAYYASI, and THEO OSHIRO, in their official capacities as Board Trustees of the Croton-Harmon Board of Education, <br> *Defendants.* | Case No. 7:24-cv-4485 |

## VERIFIED COMPLAINT

Plaintiff, Parents Defending Education, brings this complaint against Defendants, Croton-Harmon Union Free School District and several Croton officials, under 42 U.S.C. §1983 for violations of the First and Fourteenth Amendments to the U.S. Constitution.

## INTRODUCTION

1.     Nearly a century of Supreme Court precedent makes two things clear: Minor students have the freedom to speak, and students do not abandon this freedom at the schoolhouse gate. Yet the Croton-Harmon School District, along with its officials and its board of education, has rules and regulations that punish students for engaging in protected speech.

These speech codes deter students from expressing views about the political and social issues of the day that are outside the mainstream. They disregard decades of precedent.

2. The District has enacted a series of speech codes—Policies 0110, 0110-R, 0115, 0115-R, 0115-E, 5300, 4526, and 4526-R—that punish students for their speech and compel them to mouth support for the District's preferred views at all times of day, whether at school or not.

3. Policies 0110 and 0110-R prohibit "sexual" and "gender-based" harassment. Prohibited "harassment" includes "unwelcome" "conduct or communication" that is "directed at an individual because of that individual's sex, gender [identity], or sexual orientation" and that "has the purpose or effect" of "unreasonably interfering" with "a student's academic performance or participation in school-sponsored activities" or "creating an intimidating, hostile or offensive working or educational environment." Through Policies 0110 and 0110-R, the District punishes speech that other students find "unwelcome," "offensive," "disparaging," "degrading," "derogatory," intimidating," or "demeaning"—even when "the complaining individual is not the intended target."

4. Policies 0115, 0115-R, and 0115-E prohibit "'[h]arassment,'" which includes "the creation of a hostile environment" that "has or would have the effect of unreasonably and substantially interfering with a student's educational performance … or mental, emotional or physical well-being" or "would reasonably be expected to cause … emotional harm." The harassing behavior includes "verbal … actions" and "may be based on any characteristic," including "race," "national origin," "sex," or "gender identity." Prohibited harassment covers conduct "on school property" and even conduct "off school property" that "would adversely

affect the … mental, emotional or physical well-being of any individual or group of individuals."

5.      Policy 5300 is the Student Code of Conduct and contains more overbroad speech restrictions, such as prohibitions on "Defamation," "Harassment," "Intimidation," "Bullying," and "Using … abusive language or gestures."

6.      The District also has various Acceptable Use Policies (Policies 5300, 4526, and 4526-R). These policies prohibit "[c]omputer/electronic communications misuse," both on and off campus. Prohibited uses include "sending 'hate mail,'" making "discriminatory jokes and remarks," creating "inflammatory" documents or messages, and sending messages in "[s]upport or opposition for ballot measures, candidates and any other political activity."

7.      PDE brings this lawsuit to stop the District from violating the fundamental rights of students. PDE is a membership organization whose members include parents with children in the District. These students have views that the District disfavors. They hold a wide array of different views and opinions on matters of gender identity, sexual orientation, race, abortion, immigration, religion, and many other sensitive and controversial topics. For example, Parents A-C, other PDE members within the District, and their children believe, among other things, that sex is determined at birth and is immutable; that the Diversity, Equity, and Inclusion movement is a rebranded version of common racism; and that "open border" policies are destructive and dangerous.

8.      Yet the District's policies require the students to self-censor or conform their speech to the District's views on sex, gender identity, race, national origin, and other sensitive topics.

9.     The challenged policies are facially unconstitutional. They are viewpoint discriminatory because they prohibit speech that offends, sometimes even "disapprov[ing] of a subset of messages" that the school "finds offensive." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (cleaned up). They compel speech by requiring students to use a classmate's "preferred pronouns," even when those pronouns do not match the person's biology and the speaker firmly believes that sex is immutable. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (pronoun policy unconstitutionally compelled speech of a university professor); *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 563-74 (2023) (same but for K-12 teacher). The policies are also overbroad because a substantial number of their applications cover protected speech, including speech uttered daily and at the heart of the First Amendment. *See, e.g.*, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215-16 (3d Cir. 2001) (Alito, J.). The overbreadth is magnified by the fact that the policies reach off-campus student speech, even though a school's ability to reach that far is extremely limited. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187-88 (2021). Finally, Policy 4526 is unconstitutionally vague because it prohibits "political activity" without defining "political" and is thus an "indeterminate" restriction that can be "abused." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 17-18, 21 (2018).

10.     PDE brings this action to protect the constitutional rights of its members, their children, and students in the Croton-Harmon Union Free School District. *See PDE v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) ("Parents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children.").

11.     The challenged policies, and any other substantially similar policy that the District adopts or identifies, should be declared unconstitutional and enjoined.

## PARTIES

12.     Plaintiff, PDE, is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education.

13.     PDE's members include parents who live in the Croton-Harmon Union Free School District and whose children are enrolled in Croton public schools. PDE's members include Parents A-C.

14.     Defendant Croton-Harmon Union Free School District is the public school district for the village of Croton-on-Hudson, New York, which includes parts of the towns of Cortlandt and Yorktown. It operates one elementary school, one middle school, and one high school. In total, the District provides K-12 public education services to approximately 1,600 students.

15.     Defendant Stephen Walker is the Superintendent of Croton-Harmon Union Free School District. In that role, Walker is responsible for the oversight and enforcement of all Croton policies, including the policies challenged here. Walker is sued in his official capacity.

16.     Defendant John Griffiths is the Assistant Superintendent and the Dignity for All Students Act/Title IX Coordinator for the District. In that role, Griffiths is responsible for the oversight and enforcement of the policies challenged here. Griffiths is sued in his official capacity.

17.     Defendant Laura Dubak is the Principal of Croton-Harmon High School. In that role, she is responsible for the oversight and enforcement of the policies challenged here. Dubak is also a committee chairperson of the District's Committee of Respect Task Force. Dubak is sued in her official capacity.

18.     Defendant Mark Maxam is the Acting Principal of Croton-Harmon High School and the Dignity for All Students Act/Title IX Coordinator for Croton-Harmon High School. In that role, Maxam is responsible for the oversight and enforcement of the policies challenged here. Maxam is sued in his official capacity.

19.     Defendant Croton-Harmon Board of Education is responsible for the enactment and oversight of all Croton policies, including the policies challenged here.

20.     Defendants Omar Mayyasi, Anamika Bhatnagar, Ana Teague, Joshua Diamond, Sarah Carrier (President), Theo Oshiro, and Neal Haber (Vice-President) are members of the Croton-Harmon Board of Education. The Board Defendants are responsible for the enactment and oversight of all Croton policies, including the policies challenged here. The Board Defendants are sued in their official capacities.

## JURISDICTION AND VENUE

21.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §1983 and §1988.

22.     The Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343.

23.     Venue is proper under 28 U.S.C. §1391 because Croton is in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTS**

## I. Students and Their First Amendment Rights

24. The framers designed the Free Speech Clause of the First Amendment to "protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023). They "saw the freedom of speech 'both as an end and as a means.'" *Id.* "An end because the freedom to think and speak is among our inalienable human rights," and "[a] means because the freedom of thought and speech is indispensable to the discovery and spread of political truth." *Id.* (cleaned up). The First Amendment thus "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." *Id.* at 586 (cleaned up). The government also "may not compel a person to speak its own preferred messages." *Id.*

25. Public-school students, too, have First Amendment freedoms, and those freedoms do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("Minors are entitled to a significant measure of First Amendment protection." (cleaned up)). Nor do schools get to follow students home, supplanting their parents and policing their speech at all hours of the day on their own personal devices. *See Mahanoy*, 594 U.S. at 189-91. Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Id.* at 190. Protecting speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to

say it.'" *Id.* In fact, "public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government." *Id.* at 195 (Alito, J., concurring). Public school officials thus cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"; nor can they force students "to confess by word or act their faith therein." *W.V. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

26.      Antidiscrimination and anti-harassment policies are no exception. They cannot be used as a sword or a shield in ways that suppress speech on controversial topics or compel students to speak in the way that the government dictates, contrary to their deeply held beliefs. Hence why courts have a "long-standing hesitation to enforce anti-discrimination statutes in the speech context." *Green v. Miss USA, LLC*, 52 F.4th 773, 792 (9th Cir. 2022). As then-Judge Alito explained in a famous student-speech case, there is no First Amendment exception for "harassing" or "discriminatory" speech. *Saxe*, 240 F.3d at 209-10. The government "cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment'" or discrimination. *Linn Mar*, 83 F.4th at 667; *see, e.g.*, *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182-84 (6th Cir. 1995); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) ("anti-harassment laws, insofar as they regulate speech …, are subject to First Amendment scrutiny"); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (similar).

27.      "'Harassing' or discriminatory speech … may be used to communicate ideas or emotions that … implicate First Amendment protections." *Saxe*, 240 F.3d at 209. "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitu-tional protection." *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) (plurality op.). The "point

of all speech protection," after all, "is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995). "The right to provoke, offend and shock lies at the core of the First Amendment." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "Anti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield—no matter how well-intentioned." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc); *accord 303 Creative*, 600 U.S. at 592 ("When a state public accommodations law and the Constitution collide, there can be no question which must prevail."). These principles apply with more force "[i]n our current national condition," not less. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

## II. The Growing Use of Speech Codes to Punish Student Speech Involving Gender Identity and Other Controversial Topics in K-12 Schools

28.    Despite these well-established First Amendment rights, schools often seek to silence controversial student expression. Two ways are relevant here. First, speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected. Speech codes punish students for unpopular speech labeled as "harassment," "bullying," "hate speech," or "incivility"—categories so broad that school officials can use them to ban speech based on one's firmly held views including religious views, or to compel speech contrary to those views. When these policies impose vague, overbroad, or viewpoint-based restrictions on speech, they are unconstitutional.

29.     Despite the Constitution, schools are increasingly adopting speech codes regarding controversial topics, such as gender identity, sexual orientation, race, religion, and morality. *See, e.g.*, *Meriwether*, 992 F.3d at 508-09 (gender identity is a "hot issue" that "has produced a passionate political and social debate" across the country); *Janus v. AFSCME*, 585 U.S. 878, 914 (2018) ("sexual orientation," "gender identity," and "religio[n]" are "sensitive political topics [that] are undoubtedly matters of profound value and concern to the public" (cleaned up)); *Saxe*, 240 F.3d at 210 (speech about "values" lies "at the heart of moral and political discourse"); *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" and thus "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *Mahanoy*, 594 U.S. at 205 (Alito, J., concurring) (speech on "sensitive subjects like politics, religion, and social relations … lies at the heart of the First Amendment's protection").

30.     One example is a policy that requires students to use other students' "preferred pronouns," even if they are contrary to the other students' sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 731-32 (2020) (Alito, J., dissenting) ("Some jurisdictions, such as New York City, have ordinances making the failure to use an individual's preferred pronoun a punishable offense, and some colleges have similar rules." (footnotes omitted)); Esenberg & Berg, *The Progressive Pronoun Police Come for Middle Schoolers*, Wall St. J. (May 23, 2022), perma.cc/3GAY-D5TX; Cronin, *Controversy Sparks over Frisco Transgender Students' Right to Choose Preferred Pronouns*, Loc. Profile (Sept. 28, 2020), perma.cc/S3JJ-NJF6. While society has long referred to males and females by sex-specific pronouns (*e.g.*, he, his, she, her), many individuals—

including students in secondary schools—now identify as "transgender" or "nonbinary" and adopt other pronouns that correlate with their "gender identity" rather than their biological sex. *See, e.g.*, *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). Most "transgender" people "use gendered pronouns such as he and she," while others "use 'they/them' pronouns." Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 957 (2019). In addition, "[s]ome transgender people may request even more unfamiliar pronouns, such as ze (pronounced 'zee') and hir (pronounced 'hear')." *Id.*; *see Standards of Care for the Health of Transgender and Gender Diverse People*, S80, World Prof. Ass'n Transgender Health (8th ed. 2022) (They "may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others."). According to "transgender" and "nonbinary" advocates, describing people using pronouns or any other terms that are inconsistent with their gender identity is a form of "verbal bullying" that "sends a message of disrespect toward the listener" and attacks "their social standing" and "their place in society." *PDE v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 684, 703 (S.D. Ohio 2023) (citing various sources).

31.     On the other hand, many others believe that sex is immutable and wish to use pronouns that align with biology and longstanding English usage. *See Meriwether*, 992 F.3d at 508-09; *Bostock*, 590 U.S. at 731-32 (Alito, J., dissenting); *Varner*, 948 F.3d at 257. Many individuals on this side of the debate ground their positions in scientific, "religious," or "philosophical beliefs." *Meriwether*, 992 F.3d at 509. So they believe that using pronouns that align with the listener's biological sex rather than gender identity "advance[s] a viewpoint": that "sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* Conversely, using a listener's preferred

pronouns advances the opposite message: that "[p]eople can have a gender identity inconsistent with their sex." *Id.* at 507. Thus, policies that require them to use pronouns that are inconsistent with biological sex compel them to communicate an idea they do not hold. *See, e.g.*, Backholm, *Why I Don't Use Preferred Pronouns*, Fam. Rsch. Council (May 21, 2021), perma.cc/9NYR-BEK7 ("Pronouns contain a statement of belief about the nature of reality.… How would you feel if you were asked to say 'Jesus is Lord' every time you saw someone?… That's how some of us feel."). Requiring someone to affirm someone else's gender identity forces the person to take "a side in that debate," even when it is contrary to the person's deeply held convictions. *Meriwether*, 992 F.3d at 509.

32. The Constitution prohibits the State from taking sides in debates on controversial and sensitive topics, such as gender identity, race, and immigration. The First Amendment gives both sides the freedom to promote their beliefs in the marketplace of ideas, without the government tipping the scales. "[L]earning how to tolerate speech … of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022). Indeed, "tolerance, not coercion, is our Nation's answer. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands." *303 Creative*, 600 U.S. at 603. So the District cannot impose its preferred viewpoint (*e.g.*, persons can "transition" genders) over another (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate [the Supreme] Court's repeated promise that [students] do not 'shed

their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 597 U.S. at 531 (quoting *Tinker*, 393 U.S. at 506).

33.     Schools have also used speech codes to crack down on speech involving other controversial topics. For example, a student was forced to change because he was wearing a shirt that said, "There are only two genders." Hunter, *Student Continues Fight to Wear 'There Are Only Two Genders' Shirt in Appeals Court*, Wash. Exam'r (Feb. 7, 2024), perma.cc/E7GM-NF5P. Another student was reprimanded for wearing clothes that said, "Let's Go Brandon." *Students Sue After Michigan School District Forces Them to Remove 'Let's Go Brandon' Sweatshirts*, FIRE (Apr. 25, 2023), perma.cc/J3MJ-5AV8. Another student was punished for promoting the view "All Lives Matter." Schow, *First Grader Punished After Drawing 'BLM' With 'Any Life' Underneath*, DailyWire (Mar. 21, 2024), perma.cc/KU3X-PGZK. Other examples abound. *E.g.*, Griffin, *Colorado Middle-Schooler Kicked Out of Class for 'Don't Tread on Me' Patch That Teacher Claims Originated with Slavery*, N.Y. Post (Aug. 30, 2023), perma.cc/5NA9-PGF3; Gstalter, *Principal Told Teen to Remove Trump 'MAGA' Apparel on School's 'America Pride Day,'* The Hill (Apr. 13, 2019), perma.cc/7X3M-D2PJ; Luca, *Colusa Teacher Threatens to Kick Student Out of Virtual Class Over 'Trump 2020' Flag*, ABC10 (Sept. 23, 2020), perma.cc/BKR4-658R; Daley, *High School Cheerleaders on Probation for Holding MAGA Sign at Football Game*, WCNC (Sept. 16, 2019), perma.cc/D46Y-ZKAL; Passoth, *Clark County School District Sued by Pro-Life Students Over Alleged First Amendment Violations*, Fox5 (Oct. 4, 2022), perma.cc/99M7-SUHZ.

34.     In addition to speech codes, schools are increasingly turning to so-called bias response systems to invite fellow students or teachers to report on a student's disfavored speech. *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First (2022),

perma.cc/DX37-LX3F; *Bias Response Team Report 2017*, FIRE (2017), perma.cc/84NZ-SM2E. These systems began at universities, but K-12 schools have begun mimicking colleges. *See, e.g.*, *Bias Response Systems*, PDE (Sept. 11, 2023), perma.cc/RKD4-5VY7 (collecting examples); Neily, *Reading, Writing, Ratting Each Other Out*, Real Clear Educ. (June 14, 2021), perma.cc/JHM2-29DC (same); *Parents Prevail Over K-12 'Bias Incidents'*, Wall St. J. Opinion (Feb. 7, 2022), perma.cc/S6S7-5A7W.

35.    Living up to their Orwellian name, bias response systems encourage students to monitor each other's speech and report incidents (often anonymously). A listener's subjective reaction to the speech is enough to report an incident, after which school administrators can log the incident, investigate it, meet with the relevant parties, attempt to "reeducate" the "offender," and can recommend and pursue formal or informal discipline.

36.    In the university context, courts have recognized the chilling effect of bias response teams on college-aged students, who are more mature and developed than minor students in K-12 education. *See, e.g.*, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (holding that university's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech"); *Fenves*, 979 F.3d at 333 (similar); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (similar).

37.    The chilling effect is even greater in the K-12 context, where adolescents are less mature and more susceptible to pressure from authority figures. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."). The Fourth Circuit, for example, recently concluded that a high school's "Share, Speak Up, Speak Out:

Bias Reporting Form" "caused the parents' children to experience a non-speculative and objectively reasonable chilling effect on their speech." *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 164-66 (4th Cir. 2023).

## III. The District's Speech Codes Prohibiting Certain Speech on Controversial Topics

38. Despite students' fundamental right to discuss controversial issues freely and consistently with their deeply held convictions, the District has adopted some of the most aggressive speech codes in the country. These codes are designed to punish disfavored student speech concerning a host of controversial subjects, including gender identity, race, national origin, and sexual orientation. They unconstitutionally impinge on students' constitutional rights.

### A. Discriminatory-Harassment Policies

39. The District has adopted multiple "harassment" policies that prohibit a broad swath of controversial speech at the heart of the First Amendment. In so doing, the District unconstitutionally discriminates based on viewpoint, requires a student to affirm another student's gender identity when inconsistent with that student's sex, prohibits a substantial amount of protected speech, and uses vague terms that an average student cannot understand.

#### 1. Policies 0110 and 0110-R: Sex and Gender-Identity Discrimination and Harassment

40. Policy 0110 is titled "Sex Discrimination and Sexual Harassment" and was last revised March 25, 2021. The policy prohibits "sexual harassment," which includes "gender-based harassment." Sexual harassment includes "harassment against transgender, questioning, transitioning, intersexual or asexual students"; "gender-based harassment" includes "verbal …

intimidation or hostility that is based on actual or perceived gender as well as sexual stereotypes."

41.     Policy 0110-R is titled "Sexual Harassment Regulation" and was last revised March 25, 2021. This policy further implements Policy 0110. It makes clear that "'[g]ender-based harassment' means verbal, non-verbal or physical aggression, intimidation or hostility that is based on actual or perceived gender identity or expression."

42.     It also states that prohibited "[s]exual" or "gender-based harassment" includes "unwelcome" "conduct *or communication*" that is "directed at an individual because of that individual's sex, gender, or sexual orientation" and that "has the purpose *or* effect of substantially or unreasonably interfering with an employee's work performance or a student's academic performance or participation in school-sponsored activities, or creating an intimidating, hostile or *offensive* working or educational environment, even if the complaining individual is not the intended target of the conduct or communication." (Emphases added.)

43.     The policy further prohibits "[u]nacceptable [c]onduct," which includes "unwelcome and offensive name calling or profanity that is … based on sexual stereotypes or sexual orientation, gender identity or expression." The policy also prohibits "other hostile actions taken against an individual because of that person's sex, sexual orientation, gender identity or transgender status," including "name calling" or "otherwise interfering with that person's ability to work or participate in school functions and activities." And the policy prohibits "any unwelcome behavior based on sexual stereotypes and attitudes that is offensive, degrading, derogatory, intimidating, or demeaning," including "disparaging remarks" and "jokes

about … an individual because the person displays mannerisms or a style of dress inconsistent with stereotypical characteristics of the person's sex."

44. Under the policies, speech is "considered 'unwelcome' if the student did not request or invite it and regarded the conduct as undesirable or offensive."

45. The policies direct officials to "evaluat[e] the totality of the circumstances." Factors include "the degree to which the conduct affected the ability of the student to participate in or benefit from his or her education or altered the conditions of the student's learning environment"; "the type, frequency and duration of the conduct"; "the identity of and relationship between the alleged harasser and the subject of the harassment"; "the number of individuals involved"; "the age and sex of the alleged harasser and the subject of the harassment"; "the location of the incidents and context"; "other incidents at the school"; and "incidents of gender-based, but non-sexual harassment."

46. The policies cover off-schoolground conduct "if there is some nexus or relationship between the conduct at issue and the district," including when off-campus activity "substantially disrupts education" or "adversely affects the educative process."

### 2. Policies 0115, 0115-R, and 0115-E: "Dignity for All Students"

47. Policy 0115 is titled "Dignity for All Students: Prohibiting Bullying, Discrimination and Harassment of Students" and was last revised May 5, 2022.

48. The policy defines "[h]arassment" as "the creation of a hostile environment by conduct or by threats, intimidation or abuse" that

(a) "has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits within the school setting, or mental, emotional or physical well-being";

(b) "reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student"; or

(c) "reasonably causes or would reasonably be expected to cause a student to fear for their physical safety."

Prohibited harassment covers "conduct or acts constituting threats, intimidation or abuse that occur on school property." It also covers conduct that occur off school property if the conduct constitutes "threats, intimidation or abuse" and "create[s]" or "foreseeably … would"

(i) "create a risk of substantial disruption within the school environment" or

(ii) "adversely affect the educational performance, opportunities or benefits within the school setting, or mental, emotional or physical well-being of any individual or group of individuals."

49.     Incidents of bullying that any staff observes or learns of must be reported orally within one day and through the reporting form within two days.

50.     Policy 0115-R is titled "Student Harassment and Bullying Prevention and Intervention Regulation" and was last revised May 5, 2022.

51.     The District stresses that it "condemns and strictly prohibits all forms of discrimination," which includes "harassment, hazing, intimidation and bullying."

52.     The policy even prohibits activity "that takes place at locations outside of school grounds" that "can be reasonably expected to materially and substantially interfere with the

requirements of appropriate discipline in the operation of the school or impinge on the rights of other students."

53. Policy 0115-R has a materially identical definition of "'Harassment'" as Policy 0115, though it notes that the harassing behavior may be based on any characteristic, including "race," "color," "weight," "national origin," "ethnic group," "religion," "religious practice," "disability," "sex," "sexual orientation," or "gender identity and expression."

54. Prohibited harassment for both policies includes "verbal" conduct—*i.e.*, speech.

55. The policy emphasizes that "[p]revention is the cornerstone of the district's effort to address bullying" and harassment. A "staff member" is designated "the Dignity Act Coordinator (DAC) for each school" to help implement Policy 0115-R.

56. Policy 0115-E is titled "Croton-Harmon School District Bullying/Harassment Report Form." The form requests information like the alleged victim's name, the alleged harasser's name, the reporter's name, and the reporter's contact information. But the form can also be filled out anonymously, as the form makes clear that the reporter's "name and contact information is not required."

57. The form lists "[t]ypes of [e]vent[s]." The types are "physical" conduct; "[v]erbal-[t]easing, name calling, put downs, or other behavior that would hurt others"; "[e]motional/[e]xclusion"; "[c]yberbulling"; and "[o]ther." The reporter can "[s]elect all that [a]pply."

58. The form also provides boxes so that the reporter can elaborate on the events.

59. The form makes clear that "[e]ach report is taken very seriously and fully investigated."

### 3. Policy 5300: Student Code of Conduct

60.     Policy 5300 is the "Student Code of Conduct" and was last revised June 16, 2022.

61.     The Code "is based on the District's commitment to a Culture of Respect," meaning "empathy, diversity and respect for all." The District will "take all appropriate actions to realize this commitment."

62.     The Code prohibits engaging in a wide range of conduct. It prohibits a broad swath of protected speech.

63.     The Code broadly prohibits engaging in acts that are "disorderly"; "insubordinate"; "disruptive"; "destructive"; or that "endange[r] the safety, morals, health or welfare of others." For each category of prohibited activity, the Code provides a non-exhaustive list of "[e]xamples" of prohibited conduct. Examples include "Defamation," "Harassment," "Bullying," "Intimidation," and "Using … abusive language or gestures."

64.     "Defamation" includes "making false or unprivileged statements or representations about an individual or identifiable group of individuals that harm the reputation of the person or the identifiable group by demeaning them."

65.     "Harassment" includes speech that is "sufficiently severe" or "persistent" or "pervasive" and that is "directed at an identifiable individual or group" and "intended to be or which a reasonable person would perceive as hostile, ridiculing or demeaning." Prohibited harassment includes "sexual harassment, gender-based harassment, or harassment" based on "any … status protected by law," such as "race," "national origin," and "gender identity or expression."

66. "Bullying" includes "cyberbullying" and "involves a sufficiently severe action or a persistent, pervasive pattern of actions or statements directed at an identifiable individual or group which are intended to be, or which a reasonable person would perceive as, hostile, ridiculing or demeaning."

67. "Intimidation" includes "engaging in actions or statements that put an individual in fear of bodily harm."

68. The Code applies to off-campus conduct "if there is a nexus or relationship between the conduct at issue and the district." Examples of off-campus violations include "harassment, bullying and cyberbullying"; "threatening or harassing students or staff through electronic means"; or "using electronic means" to send "derogatory" messages.

69. All students are "expected to promptly report … violations" to a school official.

70. Violations of the Code of Conduct may result in disciplinary action up to suspension and expulsion.

### 4. Policies 5300, 4526, and 4526-R: Acceptable Use Policies

71. Policy 5300 prohibits "[c]omputer/electronic communications misuse," which includes violating "the District's acceptable use policy" in Policies 4526 and 4526-R. The prohibition includes "off-campus … communication to threaten, harass, or annoy school personnel and/or other students, sending 'hate mail' or creating messages or documents of a threatening or inflammatory nature."

72. Policy 4526 is titled "Access to Computer Network for Use in Instruction," and Policy 4526-R is titled "Acceptable Use for Computer and Internet Access Regulation." These policies prohibit certain uses of computers, cellphones, and the Internet. The District requires

students to sign a contract declaring that they will follow these policies, and again, the Code of Conduct specifies that a violation of these policies is a violation of the Code.

73.     Policy 4526 prohibits using a school or personal electronic device to express "[s]upport or opposition for ballot measures, candidates and any other political activity." It also prohibits using such devices for "[c]yberbullying, hate mail, defamation, harassment of any kind, discriminatory jokes and remarks, or any communication that could reasonably be construed as racist, sexist, abusive or harassing to others."

74.     Policy 4526-R provides a non-exhaustive list of "prohibited behaviors," including "[s]ending hate mail, making discriminatory remarks, and any other similar antisocial activities"; "[u]sing the Internet to harass … other people"; "[e]ngaging in use with the purpose to cause others personal humiliation or embarrassment"; and "[u]sing … abusive … language in either private or public messages."

75.     Violating any of these policies, even a "single" time, can result in consequences, such as loss of access to the device or the Internet and "other disciplinary or corrective action in accordance with the Code of Conduct."

### B.     Reporting and Enforcement of School Policies

76.     The District provides several ways to file a complaint against a student or teacher, including a hotline and reporting system—the District's own version of a bias response system.

77.     In general, the District provides a "Bullying/Harassment Report Form" (Policy 0115-E). But individuals can also report conduct "by letter or verbally" to a school official,

such as the "Superintendent," "Title IX coordinator," or "Dignity Act coordinator." The reporting form can be submitted anonymously.

78.     Students also can report anonymously on the District's "Anonymous Alerts" system. Reports can be made online or by phone. Anyone, including those merely in the "[c]ommunity," can file a report. The District "encourage[s]" everyone "to report important issues."

79.     The District provides students with examples of concerns that they ought to report. The District includes as examples not just violent or dangerous crimes but also "bullying/harassment/teasing" or "cyberbullying." According to the bias response system, "[h]arassment" "covers a wide range of behaviors … that are intended to disturb or upset, and usually repetitive in nature."

80.     The response system provides examples for the "Location" of the incident, which includes "Online/Social Media," "By Phone," "Home," and "In Town." The response system also has an area where the reporter can describe the events and provide other relevant information.

81.     Reporting discrimination and harassment is required by students and staff.

82.     The District has even assembled a "Culture of Respect Task Force" dedicated "to maintain[ing] a culture focused on the prevention" of "harassment" and "bullying." This "special task force" is "comprised of students, faculty and parents to broaden educational opportunities to address these serious matters." A goal of the "task force" is necessarily to coerce orthodoxy of viewpoint and weed out speech that is in the minority at the school, in the District, or in the community.

83.     Violations of school policy or the Code of Conduct can ultimately result in suspension and expulsion. Other punishments include oral warning, written warning, notification of parent, detention, suspension from transportation, suspension from athletic participation, suspension from social or extracurricular activities, in-school suspension, and removal from classroom.

## IV.     PDE's Members and This Litigation

84.     PDE has members who live in the Croton-Harmon Union Free School District and whose children attend Croton public schools. These members and their children are suffering concrete injuries as a direct result of the District's unconstitutional policies. The students want to engage in speech that is arguably covered by the challenged policies, but they credibly fear that the expression of their deeply held views is prohibited. Rather than risk being reported, investigated, or sanctioned, PDE's members and their children—including Parents A-C—do not speak as freely as they otherwise would.

85.     Parents A, B, and C are members of PDE.

86.     Parent A lives within the boundaries of the Croton-Harmon Union Free School District and is the parent of several school-aged children. Each of Parent A's children attended a District school last year and will attend a District school next year, including the high school. Parent A will have at least one child in a District high school until 2030.

87.     Parent A believes that sex is binary, immutable, and determined by biology rather than someone's internal feelings. Though Parent A acknowledges that gender dysphoria is real, Parent A believes it is a rare condition that affects a tiny fraction of the population. Parent A also thinks there is a difference between clinical gender dysphoria and a child's

confusion about their gender, and that the latter is increasingly misdiagnosed as the former. Parent A believes that confusion about gender can be a part of adolescence, and it usually does not persist beyond adolescence unless it is reinforced by adults. Parent A believes that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex. Parent A believes that concerns about gender identity are sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem from Parent A's sincerely held religious beliefs, as well as science and common sense.

88. Parent A also believes that marriage is between a man and a woman. Parent A believes that the nuclear family is the building block of society and that children do best when they are raised by a father and a mother. Parent A thinks it's immoral for two men to pay a "surrogate mother" to carry a baby for them. Parent A believes that surrogacy arrangements— even if well intentioned—prioritize the wishes of adults over the wellbeing of children. Parent A also thinks that surrogacy is inherently exploitive when the "surrogate" is a woman in difficult financial circumstances with few options. Parent A's views on these issues, too, stem partly from Parent A's religious beliefs.

89. Parent A is pro-life. Parent A believes that all human life has value, and that abortion has no place in a civilized society. Parent A believes that defenseless infants do not lose their right to life just because adults find their existence inconvenient.

90. Parent A also believes that the Black Lives Matter organization has had a corrosive impact on race relations in America. Parent A does not believe that any person is inherently "privileged" due to the color of their skin or that America is a systemically racist country.

91.     Parent A believes that the Diversity, Equity, and Inclusion movement is just a rebranded version of common racism. Parent A believes that any ideology that categorizes people as "oppressed" or "oppressors" based on their skin color is corrosive to society and fundamentally un-American. Parent A believes that giving preferences to college or job applicants based on their race is immoral and unconstitutional and that government institutions should be focused on equal opportunity rather than "equity."

92.     Parent A strongly opposes illegal immigration and believes that "open border" policies are destructive and dangerous. Parent A believes that the government must enforce our immigration laws. The unchecked flow of illegal immigrants across our southern border, in Parent A's view, is straining social programs in our communities. Parent A thinks it is deeply unfair that local governments are diverting public resources away from students and needy families who live in this country legally and using them to provide for those who have no right to be here.

93.     Parent A has raised Parent A's children to share Parent A's views, including on sex, gender identity, marriage, race, and immigration. Parent A's children, like Parent A, are politically conservative and hold views that are unpopular, controversial, and in the minority at their schools, in the District, and in their community. Parent A has taught them to share their beliefs and to tell the truth, even when their beliefs are unpopular.

94.     For example, Parent A's children believe that biological sex cannot be changed and that gender does not exist on a spectrum. They want to share this view, including through the use of biologically accurate pronouns rather than someone's "preferred pronouns." They do not want to be forced to "affirm" that a biologically male classmate is female—or vice

versa—or that a classmate is a third gender and neither male nor female. Doing so would contradict the deeply held beliefs of Parent A's family, including the beliefs that Parent A has imparted to them and their own sincerely held religious beliefs.

95. Parent A's children, like Parent A, also strongly believe that a biological male who identifies as female should not be allowed to compete in women's sports; that it is an invasion of privacy for students to share bathrooms with the opposite sex; that children are healthiest when they are raised in traditional families; that surrogacy is immoral and exploitive; that abortion should be illegal; that most DEI programs are thinly veiled racial discrimination; and that the government should enforce our immigration laws against people who are here unlawfully.

96. Parent A's children know and regularly interact with teachers, administrators, and other students who deeply disagree with their beliefs about gender identity, the traditional family, abortion, DEI, and immigration.

97. When a classmate or another member of the school community voices contrary views about these issues or other controversial topics during class or school-sponsored activities, Parent A's children want to point out the flaws in their arguments and convince them to change their minds. Parent A's children want to talk directly to their classmates about these topics, and to speak frequently and repeatedly, including through electronic communications. Given their views, Parent A's children know that many of these conversations will be heated and passionate. But Parent A's children want to express their deeply held views.

98. Parent A's children, however, do not fully express themselves in those circumstances, and others, because they fear that expressing their beliefs will cause them to be

punished for violating school policies. Parent A's children are thus reluctant to openly and completely express their opinions or have these conversations. If Parent A's children do express their opinions, they do so selectively with a small circle of friends whom they believe will not take offense to their views, and even in those circumstances, Parent A's children do not always express the full scope of their views for fear that their controversial views will cause offense, in violation of the challenged policies.

99.     Parent A's children do not fully express themselves or talk about certain issues in class or at school-sponsored activities because they fear that sharing their beliefs will be considered "harassment." For example, they fear that others will find their views "hostile," "ridiculing," or "demeaning" and claim that their views "interfer[e] with" their educational environment or their "mental [or] emotional … well-being," especially if they share those views repeatedly. Many of the topics that Parent A's children want to address could easily be considered "harassment" or similar terms under the challenged policies.

100.    Parent A's children also want to share their views on schoolgrounds or at school-sponsored activities by wearing clothing or other items that express their viewpoints on sex, gender identity, and race. But Parent A's children are reluctant to fully express all their views through clothing or other items because they fear that expressing their beliefs to the full extent through how they dress will cause them to receive backlash, be socially ostracized, and cause others to accuse them of "denigrat[ing]" others in violation of school policies.

101.    Parent A wants Parent A's children to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive. Parent A does not want Parent A's children to be forced to

affirm beliefs about controversial topics like gender identity that are inconsistent with their deeply held convictions.

102. Parent A is concerned that Parent A's children will be subjected to formal discipline unless they affirm ideas that are inconsistent with their deeply held beliefs. Parent A believes that discipline for speech consistent with their deeply held convictions is detrimental to their school experience and will harm their college admission chances and extracurricular opportunities.

103. Being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent A's children by forcing them to "choose" between expressing their beliefs and following the instructions of teachers and other Croton authority figures.

104. The process of being disciplined—or even investigated—for stating their beliefs will expose Parent A's children to reputational harm and personal attacks from other students and members of the Croton community.

105. Parent A's constant anxiety that Parent A's children will be subjected to this harm has, in turn, caused Parent A emotional and psychological harm. It has caused Parent A to question whether to instruct Parent A's children to follow their conscience and their religious faith or to remain silent and affirm viewpoints contrary to their conscience and faith in order to preserve their opportunities for college. It has also caused Parent A to question whether to subject Parent A's children to harm by not withdrawing them from Croton, even though their family cannot afford the financial strain that would impose.

106. The challenged policies have impaired and continue to impair Parent A's ability to exercise Parent A's fundamental right as a parent to guide the upbringing of Parent A's

children and to instill Parent A's children with important values. The policies are also impairing Parent A's ability to direct Parent A's children to seek and facilitate open, robust intellectual discussions on gender identity, religion, immigration, and racism, with the goal of changing Parent A's children's peers' minds or, at a minimum, helping those students understand Parent A's children's perspectives.

107.    Parent B lives within the boundaries of the Croton-Harmon Union Free School District and is the parent of more than one school-aged child. Each of Parent B's children attended a District school last year, including at least one attending the middle school. Each will attend a District school next year.

108.    Parent B believes that human beings are either male or female, that sex cannot change based on someone's internal feelings, and that people cannot "transition" from one sex to another. Parent B does not believe that people have a separate "gender identity" that "exists on a spectrum" outside their biological sex. Parent B acknowledges that gender dysphoria exists but believe that it is a historically rare condition. Parent B thinks that most children who assert a "transgender" or "nonbinary" identity are confused, and that this confusion will resolve itself unless adults make it worse. Parent B believes that a biological male who identifies as female should not be allowed to compete in women's sports and that it is an invasion of privacy for students to share bathrooms with the opposite biological sex. Parent B believes that concerns about gender identity are sensitive issues that should be left to families to discuss and resolve, not to schools.

109.    Although Parent B believes that some diversity programs are well-meaning and beneficial to society, Parent B believes that many institutions today, under the guise of

"Diversity, Equity, and Inclusion," distort and abuse good-faith notions of diversity, creating programs that are a rebranded version of common racism and immoral.

110.    Parent B believes that the U.S. Constitution is a valid document that has grounded the creation of the greatest country in the history of the world: the United States of America. That the drafters and ratifiers of the Constitution were white men does not mean that the document or this country today is fundamentally racist or sexist. The Constitution's enshrinement of principles of separation of powers, checks and balances, federalism, and democratic processes that allow for changes is a superior system than many other countries and completely legitimate. Though not perfect, society constantly deals with the least-worst solution. Just because a document or institution is not perfect does not mean that the institution is broken.

111.    Parent B is a strong supporter of Israel's right to exist and believes that many people in the "pro-Palestinian" movement either tolerate antisemitism or are antisemitic themselves.

112.    Parent B strongly opposes illegal immigration and believes that "open border" policies are destructive and dangerous. Parent B believes that the government must enforce our immigration laws. Parent B thinks that the unchecked flow of illegal immigrants across our southern border is straining social programs in our communities. In Parent B's view, it is deeply unfair that local governments are diverting public resources away from students and needy families who live in this country legally and using them to provide for those who have no right to be here. Parent B thinks that public schools like Croton should focus on educating students who are here legally instead of spending time and resources trying to accommodate

students who are here illegally. Parent B thinks it is a travesty that public schools in New York have been forced to hold classes online because school facilities are being used to house migrants who are exploiting the system.

113. Parent B has raised Parent B's children to share Parent B's views, including on sex, Israel's right to exist, gender identity, racism, the pro-Palestinian movement, and immigration. Parent B's children, like Parent B, hold views that are unpopular, controversial, and in the minority at their schools, in the District, and in the community. Parent B has taught them to share their beliefs and to tell the truth, even when their beliefs are unpopular.

114. For example, Parent B's children believe that biological sex is immutable, that gender does not exist on a spectrum, and that sex does not change based on someone's internal feelings. They do not want to be forced to "affirm" that a biologically male classmate is female—or vice versa—or that a classmate is a third gender and neither male nor female. Doing so would contradict the deeply held beliefs of Parent B's family, including Parent B's beliefs that Parent B has imparted to them and their own sincerely held beliefs.

115. Parent B's children wish to use pronouns that are consistent with a teacher's or classmate's biological sex rather than their "preferred pronouns"—the pronouns that the classmate or teacher has decided reflects their "gender identity." Parent B's children wish to use the biologically accurate pronouns repeatedly and at all times, including inside and outside the classroom, in the classmate's or teacher's presence, and when referring to the classmate or teacher outside their presence.

116. Parent B's children, like Parent B, also strongly believe that a biological male who identifies as female should not be allowed to compete in women's sports; that it is an

invasion of privacy for students to share bathrooms with the opposite biological sex; that many DEI programs engage in racial discrimination; that the Constitution is a valid document; that support for Palestine is often animated by hatred against Jews; that Israel has a right to exist; and that the government should enforce our immigration laws against people who are here illegally.

117.    Parent B's children know and regularly interact with teachers, administrators, and other students who strongly disagree with their beliefs about sex, gender identity, race, Israel's right to exist, immigration, and the pro-Palestinian movement.

118.    When a classmate or another member of the school community voices contrary views about these issues or other controversial topics during class or school-sponsored activities, Parent B's children want to point out the flaws in their arguments and convince them to change their minds. Parent B's children want to talk directly to their classmates about these topics, and to speak frequently and repeatedly. Given their views, Parent B's children know that many of these conversations will be heated and passionate. But Parent B's children want to express their deeply held views.

119.    Parent B's children censor themselves, however, because they fear that expressing their beliefs will cause them to be punished for violating school policies. Parent B's children are thus reluctant to openly express their opinions or have these conversations.

120.    Parent B's children do not fully express themselves or talk about certain issues in class or at school-sponsored activities because they fear that sharing their beliefs will be considered "harassment" or similar terms used by the challenged policies. For example, they fear that others will find their views "hostile," "ridiculing," or "demeaning" and claim that

Parent B's children's views "interfer[e] with" their educational environment or their "mental [or] emotional … well-being," especially if Parent B's children share those views repeatedly. Many of the topics that Parent B's children want to address could easily be considered "harassment" or similar terms under the challenged policies.

121. Parent B's children also want to share their views about gender identity, DEI, Israel's right to exist, immigration, and other controversial topics with other students and the Croton community during off-campus activities with no connection to any school-related activity, including through their personal phones, computers, and on social media.

122. Parent B's children censor themselves in these circumstances too, however, because they know that the challenged policies apply even to digital communications and off-campus conversations.

123. Parent B's children also want to share their views on schoolgrounds or at school-sponsored activities by wearing clothing or other items that express their viewpoints on sex, gender identity, Israel's right to exist, race, immigration, and other controversial topics. Although Parent B's children sometimes wear clothing or items expressing views on a small subset of controversial topics, they have received backlash from classmates and administrators, causing Parent B's children to wear such clothing less often in the future than they would otherwise and to censor themselves on other topics they wish to express viewpoints because they fear that expressing their beliefs through how they dress will cause them to be punished for violating school policies.

124. Parent B's children's fears of speaking openly are informed by years of their personal experience with the District and its officials.

125.   Parent B wants Parent B's children to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive.

126.   Parent B is concerned that Parent B's children will be subjected to formal discipline unless they affirm ideas that are inconsistent with their sincerely held beliefs. Discipline for speech consistent with their deeply held convictions is detrimental to their school experience and will harm their college admission chances and extracurricular opportunities.

127.   Being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent B's children by forcing them to "choose" between expressing their beliefs and following the instructions of teachers and other Croton authority figures.

128.   The process of being disciplined—or even investigated—for stating their beliefs will expose Parent B's children to reputational harm and personal attacks from other students and members of the Croton community.

129.   Parent B's children have repeatedly told Parent B that they want to go to school in an environment that allows them to express their views.

130.   Parent B's constant anxiety that Parent B's children will be subjected to this harm has caused Parent B psychological and emotional harm. It has caused Parent B to question whether to instruct Parent B's children to follow their conscience or to remain silent and affirm viewpoints contrary to their conscience in order to preserve their opportunities for college. It has also caused Parent B to question whether Parent B is subjecting Parent B's children to harm by not withdrawing them from Croton, even though Parent B's family cannot afford the financial strain that would impose.

131. The challenged policies have hindered and continue to hinder Parent B's ability to exercise Parent B's fundamental right as a parent to guide the upbringing of Parent B's children and to instill Parent B's children with important values. They are also impairing Parent B's ability to direct Parent B's children to seek and facilitate open, robust intellectual discussions on sex, immigration, racism, and other controversial topics with the goal of, at the very least, helping those students understand Parent B's children's perspectives. At a minimum, the District's policies have forced and will continue to force Parent B to have difficult discussions about sex, gender identity, and other sensitive topics with Parent B's children before they are ready.

132. Parent C lives within the boundaries of the District and is a parent of a school-aged child. Parent C's child is a senior at a District high school.

133. Parent C believes that human beings are either male or female and that people cannot "transition" from one sex to another. Parent C does not believe that people have a separate "gender identity" that exists outside of their biological sex. Parent C thinks that most adolescents who assert a "transgender" or "nonbinary" identity are confused and that this confusion will resolve itself unless adults make it worse. Parent C believes that "affirming" someone's belief that they are a man or a woman—or that they are neither male nor female— only hurts that person in the long run and forces everyone else to lie to them in the process. As a matter of science, safety, and common sense, Parent C believes that access to bathrooms, locker rooms, changing rooms, competitive sports, and other sex-specific activities should be determined by biological sex alone, rather than with reference to amorphous concepts of

"gender identity." Parent C believes that concerns about gender identity are sensitive issues that should be left to families to discuss and resolve, not to schools.

134. Parent C opposes the Diversity, Equity, and Inclusion movement and believes it is stoking racial division in our societal institutions, including our schools. Parent C thinks the concept of "white privilege" is fundamentally racist, just like any other belief that assigns attributes to people based on their race or ethnicity. Parent C believes that affirmative action, reparations, and programs that award benefits or limit participation only to racial minorities are often thinly veiled attempts to punish current generations for the sins of their ancestors. Parent C likewise believes that the recent trend of promoting "racial equity" instead of "racial equality" is punitive and retributive in nature.

135. Parent C has raised Parent C's child to think independently and to question authority. On many subjects, Parent C's child, like Parent C, holds politically conservative views that are unpopular, controversial, and in the minority at their school, in the District, and in the community.

136. For example, Parent C's child believes that people cannot have a "gender identity" that is independent from their biological sex and that many students who claim to be "transgender" or "nonbinary" are either confused or seeking attention. Parent C's child does not want to be forced to "affirm" that a biologically male classmate is female—or vice versa— or that a classmate is a third gender and neither male nor female. Parent C's child and Parent C both believe that affirming such beliefs is tantamount to elevating ideology over science.

137. Parent C's child wishes to use pronouns that are consistent with a teacher's or classmate's biological sex rather than their "preferred pronouns." Parent C's child wishes to

use the biologically accurate pronouns repeatedly and at all times, including inside and outside the classroom, in the classmate's or teacher's presence, and when referring to the classmate or teacher outside their presence.

138. Parent C's child, like Parent C, also strongly believes that males who identify as "transgender women" have no place in female sports and that the DEI and "racial equity" movements are racist and destructive.

139. Parent C's child knows and routinely interacts with students who identify as "transgender" or "nonbinary" at school. Parent C's child also knows and regularly interacts with teachers, administrators, and other students who deeply disagree with Parent C's child's beliefs about gender identity and DEI.

140. When a classmate or another member of the school community voices contrary views about these issues or other controversial topics during class or school-sponsored activities, Parent C's child wants to point out the flaws in their arguments and convince them to reconsider their beliefs. Parent C's child is more than capable of making a compelling argument against the prevailing ideology, and Parent C knows this because Parent C and Parent C's child have spoken about these issues in the privacy of their home.

141. Parent C's child self-censors, however, because Parent C's child expects that expressing beliefs Parent C's child holds risks punishment for violating school policies. Parent C's child is thus unwilling to openly express Parent C's child's opinions or have these conversations. Despite the District's focus on "safe spaces," Parent C's child knows that there will be consequences for taking positions that challenge the prevailing community orthodoxy.

142. Parent C's child does not fully express Parent C's child's opinion or talk about certain issues in class or at school-sponsored activities because Parent C's child believes that others, including students, faculty, and administrators, will consider expressing these opinions to be "harassment." Parent C's child knows that others will find Parent C's child's views "hostile," "ridiculing," or "demeaning" and understands that if any such person claims that Parent C's child's views "interfer[e] with" their educational environment or their "mental [or] emotional … well-being," those claims will be taken seriously and could potentially lead to discipline, especially if Parent C's child shares those views repeatedly. Many of the topics that Parent C's child wants to address could easily be interpreted as "harassment" or similar terms under the District's policies.

143. Parent C's child's apprehension about speaking openly is informed by years of personal experience with the District and its officials.

144. Parent C wants Parent C's child and all children of the school district to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with those beliefs or find them offensive. Parent C does not want Parent C's child to be forced to affirm beliefs about controversial topics like gender identity that are inconsistent with Parent C's child's own deeply held and considered beliefs.

145. Parent C is concerned that Parent C's child could be subjected to formal discipline unless Parent C's child affirms ideas that are inconsistent with Parent C's child's own beliefs. Parent C believes that discipline for speech consistent with Parent C's child's deeply held convictions would be detrimental to Parent C's child's school experience and would harm college admission chances and extracurricular opportunities.

146.     The process of being disciplined—or even investigated—for stating their beliefs would expose Parent C's child to reputational harm and personal attacks from other students and members of the Croton community.

147.     Parent C's concern that Parent C's child could be subjected to this harm has, in turn, caused Parent C to question whether to instruct Parent C's child to follow Parent C's child's conscience or to remain silent and affirm viewpoints contrary to Parent C's child's conscience in order to preserve opportunities for college.

148.     Parents A-C sincerely want their children to express their views, including on controversial topics, and to not be compelled to mouth support for views on sensitive topics that they disagree with.

149.     Parents A-C's and their children's concerns are genuine, sincere, and occurring now. Parents A-C joined PDE and authorized them to file this suit on their behalf because they lack resources and expertise to vindicate these rights on their own.

150.     Parents A-C are participating in this litigation under pseudonyms because they fear that if their identities are discovered, they or their children will suffer retaliation from the District, its employees, other students, other parents, and members of the broader community. Parents A-C also do not want their children's teachers, fellow students, or the colleges and employers they apply to in the future to hold Parents A-C's participation in this lawsuit against them. And they want to protect the identity and privacy of their children concerning these deeply sensitive issues.

# COUNT I

## Violation of the First Amendment: Content- and Viewpoint-Based Discrimination
### (Policies 0110, 0110-R; Policies 0115, 0115-R, 0115-E; Policy 5300)

151.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

152.    The challenged policies are viewpoint- and content-based restrictions on speech in violation of the First Amendment. To pass constitutional muster, any regulation of student speech by the District must, at a minimum, overcome two obstacles: (1) it must be viewpoint neutral; and (2) it must be consistent with the demanding *Tinker* standard. The challenged policies surmount neither obstacle.

153.    The Supreme Court has recognized only four "specific categories of speech that schools may regulate in certain circumstances," *Mahanoy*, 594 U.S. at 187:

(1) "'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds," *id.* (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986));

(2) "speech, uttered during a class trip, that promotes 'illegal drug use,'" *id.* at 187-88 (quoting *Morse v. Frederick*, 551 U.S. 393, 409 (2007));

(3) "speech that others may reasonably perceive as 'bearing the imprimatur of the school,' such as that appearing in a school-sponsored newspaper," *id.* at 188 (cleaned up) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)); and

(4) on-campus and some off-campus speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," *id.* (quoting *Tinker*, 393 U.S. at 513).

154.    Importantly, the fourth category requires schools to meet a "demanding standard." *Id.* at 193. To justify barring speech, a school must "show that its action was caused by

something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509; *accord Linn Mar*, 83 F.4th at 667. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508.

155.    "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); *accord Texas v. Johnson*, 491 U.S. 397, 414 (1989). At all times, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 829 (1995). Speech restrictions "based on viewpoint are prohibited." *Mansky*, 585 U.S. at 11; *see, e.g., Iancu*, 588 U.S. at 396-98; *Shurtleff v. Boston*, 596 U.S. 243, 258-59 (2022); *Cartwright*, 32 F.4th at 1126 ("Restrictions … based on viewpoint are prohibited, seemingly as a *per se* matter." (cleaned up)).

156.    The First Amendment's prohibition on viewpoint discrimination applies no differently in the public-school setting. *See, e.g., Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008); *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001) ("[E]ven if there has been racial violence that necessitates a ban on racially divisive symbols, the school does not have the authority to enforce a viewpoint-specific ban on racially sensitive symbols and not others."); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("[A] school that permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality."); *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617,

633 (2d Cir. 2005) ("a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests"); *Collins v. Putt*, 979 F.3d 128, 135 (2d Cir. 2020) (same). Thus, even if a school's regulation is "consistent with … the *Tinker* standard," it will still be unconstitutional if it fails the Supreme Court's "prohibition on viewpoint discrimination." *Barr*, 538 F.3d at 571; *e.g.*, *Cartwright*, 32 F.4th at 1127 n.6; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

157.    For good reason: Viewpoint discrimination is an 'egregious form of content discrimination.'" *Iancu*, 588 U.S. at 393. It's "poison to a free society." *Id.* at 399 (Alito, J., concurring). And it's "the greatest First Amendment sin." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024).

158.    Here, the District has several overlapping "harassment" policies—Policies 0110, 0110-R, 0115, 0115-R, 0115-E, Policy 5300—that discipline students for the content and viewpoint of their speech. Specifically, the challenged policies bar speech that is "unwelcome," "offensive," "hostile," "degrading," "derogatory," "intimidating," "abusive," "hate[ful]," "discriminatory," "inflammatory," "ridiculing," or "demeaning."

159.    These policies are classic viewpoint-based regulations of speech. "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality op.); *see Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.) ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint."); *Meriwether*, 992 F.3d at 507-09 (requiring affirmance of a person's gender identity that is inconsistent with the

person's biological sex is viewpoint discrimination). Policies that regulate offensive speech, like the policies challenged here, impose "viewpoint-discriminatory restrictions." *Saxe*, 240 F.3d at 206. Courts have long recognized that, when harassment policies reach speech, they necessarily impose "viewpoint-discriminatory restrictions." *DeAngelis*, 51 F.3d at 596-97; *accord, e.g.*, *Wollschlaeger*, 848 F.3d at 1307; *DeJohn*, 537 F.3d at 316.

160. Moreover, the policies do not bar "harassment" alone; they bar "harassment" based on various classifications (*e.g.*, race, sex, and gender identity). By barring speech based on some classes and not others, the District "disapprov[es] of a subset of messages it finds offensive." *Iancu*, 588 U.S. at 393. It "license[s] one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992). The government can't license one side to speak freely while muzzling the other. *See id.*; *Zamecnik*, 636 F.3d at 876.

161. Because the District's policies are viewpoint-based restrictions on speech, they are necessarily unconstitutional, even in K-12 schools. *See, e.g.*, *Barr*, 538 F.3d at 571; *Cartwright*, 32 F.4th at 1127 n.6 (noting that even if *Tinker* allows a school to "restrict harassing speech that disrupts the school's functions, it couldn't do so … based on the viewpoint of that speech"); *Holloman*, 370 F.3d at 1280 ("[T]his fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren."). The challenged policies thus violate the Constitution.

162. Independently fatal, the policies are also content-based restrictions without sufficient justification. A policy "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163

(2015). A policy can be content-based "on its face" or because of its "purpose and justification." *Id.* at 166. These policies are, at a minimum, facially content-based because their definitions hinge on the listener's response—whether the speech is "unwelcome," "offensive," "demeaning," etc. It's well-established that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *accord Saxe*, 240 F.3d at 209; *Cartwright*, 32 F.4th at 1126 (policy content-based because it "imposes differential burdens upon speech on account of the topics discussed and draws facial distinctions defining regulated speech by particular subject matter when it prohibits speech about any of a long list of characteristics" (cleaned up)). The challenged policies cannot survive strict scrutiny; nor can they be saved by the limited categories of speech restrictions generally permissible in the K-12 context. *See Mahanoy*, 594 U.S. at 187-88.

163.    The challenged policies also deviate from *Tinker*, rendering them content-based restrictions without sufficient justification. "*Tinker* places the burden of justifying student-speech restrictions squarely on school officials." *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022); *accord Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020); *Trachtman v. Anker*, 563 F.2d 512, 5117 (2d Cir. 1977). That burden is "demanding." *Mahanoy*, 594 U.S. at 193. Here, the District cannot overcome its demanding burden when the challenged policies don't even try to hew to the *Tinker* standard.

164.    The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT II
### Violation of the First Amendment: Compelled Speech
### (Policies 0110, 0110-R; Policies 0115, 0115-R, 0115-E; Policy 5300)

165.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

166.     The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 585 U.S. at 892 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 585 U.S. at 892.

167.     Here, Policies 0110, 0110-R, 0115, 0115-R, 0115-E, and 5300 unconstitutionally compel student speech.

168.     The children of Parents A-C believe that biological sex is inherent and immutable. They do not want to be forced to "affirm" that a biologically male student is female—or vice versa—or that another student is neither male nor female; doing so would contradict their deeply held beliefs (including, for some of them, their religious convictions). Yet that is exactly what the challenged policies require, which is unconstitutional.

169.    *Meriwether* is on point. 992 F.3d 492. There, the Sixth Circuit held that a similar "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)). "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508. Accordingly, the policy there unconstitutionally compelled the plaintiff "to communicate a messag[e] [that] [p]eople can have a gender identity inconsistent with their sex." *Id.* at 507.

170.    So too here. "No government … may affect a speaker's message by forcing her to accommodate other views; no government may alter the expressive content of her message; and no government may interfere with her desired message." *303 Creative*, 600 U.S. at 596 (cleaned up). The District thus cannot force the children of PDE's members to "mouth support" for beliefs they do not hold, especially for "controversial subjects" like "gender identity." *Janus*, 585 U.S. at 892, 913-14.

171.    That the challenged policies do not literally require students to speak is of no moment. Using pronouns is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). The challenged policies prohibit students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and a directive not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. The District thus "cannot force

[students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326.

172.     These policies are little different from the policy that required schoolchildren to pledge allegiance to the flag in *Barnette*. Like West Virginia in *Barnette*, the District is requiring students to declare statements that they believe to be false and affirm ideologies that they deeply disagree with. 319 U.S. at 631, 633; *see Wooley*, 430 U.S. at 715 (state cannot require message on license plates, even though no one is required to drive); *Hurley*, 515 U.S. at 575-76 (parade organizers cannot be forced to include certain groups in a parade, even though no one is required to hold a parade).

173.     By requiring students to speak in a way that "contravene[s] their convictions on threat of punishment or expulsion," the District is violating their First Amendment rights. *303 Creative*, 600 U.S. at 589 (citing *Barnette*, 319 U.S. at 626-29). Compelling students to speak a certain viewpoint alone dooms a speech restriction: Compelled speech is "the most aggressive form of viewpoint discrimination." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012). "When speech is compelled, … additional damage is done" because "individuals are coerced into betraying their convictions." *Janus*, 585 U.S. at 893. The harm is particularly acute in the K-12 context. That schools "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637.

174.     In sum, the Constitution prohibits the District from picking winners and losers in the gender-identity debate. *See Meriwether*, 992 F.3d at 506 ("By defendants' logic, a university

could likewise *prohibit* professors from addressing university students by their preferred gender pronouns—no matter the professors' own views. And it could even impose such a restriction while denying professors the ability to explain to students why they were doing so."). Schools cannot effectively compel their preferred viewpoint (*e.g.*, persons can "transition" genders) and ban the opposing viewpoint (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate [the Supreme] Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 597 U.S. at 531 (quoting *Tinker*, 393 U.S. at 506).

175. The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT III
### Violation of the First Amendment: Overbreadth
### (Policies 0110, 0110-R; Policies 0115, 0115-R, 0115-E;
### Policy 5300; Policies 4526, 4526-R)

176. Plaintiff repeats and realleges each of the prior allegations in this complaint.

177. "In the First Amendment context," courts recognize a special kind of facial challenge based on overbreadth. *Ams. for Prosperity Found. v. Bonta (AFPF)*, 594 U.S. 595, 615 (2021). Namely, a regulation is facially invalid "if a substantial number of its applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." *Id.* The key question is whether "the [policy] itself" poses "a realistic danger" of chilling constitutionally protected speech. *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). "'Because First Amendment freedoms need breathing space to survive, a government may regulate in the area only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A policy is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

178.    The overbreadth doctrine applies no differently in the school context. If a school policy is unconstitutional in a "substantial" number of applications, then the policy is overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 216; *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 259-60 (4th Cir. 2003) (policy forbidding students from wearing shirts that depicted weapons was overbroad because there was no evidence the policy was necessary to prevent substantial disruption or invasion of rights of others). Indeed, a consistent line of cases has found school harassment policies to be unconstitutionally overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 215-16 (high-school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 701-04 (W.D. Pa. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad); *Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*, 285 F. Supp. 2d 987, 990, 995 (E.D. Mich. 2003) (speech policy prohibiting "verbal assault" was overbroad because it allowed "curtailment of speech that questions the wisdom or judgment of school administrators and their policies, or challenges the viewpoints of [other] students"); *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123-24 (D. Mass. 2003) (school policy allowing only "responsible" speech was likely unconstitutional).

179.    The challenged policies are unconstitutionally overbroad. They cover a substantial amount of protected speech, including a broad swath of speech uttered daily.

180.    The challenged policies punish countless forms of protected speech. Consider the statement: "I believe that people are created either male or female and that a person cannot transition from one sex to another." This speech is protected, yet it could easily be deemed "unwelcome," "offensive," "hostile," "degrading," "derogatory," "intimidating," "abusive," "hate[ful]," "discriminatory," "inflammatory," "ridiculing," or "demeaning." Consider, too, other speech that the students want to engage in: that it is an invasion of privacy for students to share bathrooms with the opposite biological sex; that many DEI programs engage in racial discrimination; that support for Palestine is often animated by hatred against Jews; and that the government should enforce our immigration laws against people who are here illegally. This speech is likewise protected, yet it too appears to violate the challenged policies.

181.    It is no answer to say that the challenged policies are merely prohibiting "harassment." While "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin" or another characteristic. *Saxe*, 240 F.3d at 206. Here, the challenged policies unquestionably cover *speech*.

182.    After all, the Supreme Court explained in *Davis v. Monroe County Board of Education* how to draw the line between discriminatory harassment that is punishable conduct and discriminatory harassment that is protected speech. *Davis* held that schools can violate Title IX's ban on sex-based discrimination if they are deliberately indifferent to sexual harassment by students. 526 U.S. 629, 633 (1999). At the same time, the Court adopted a narrow definition of actionable "harassment." The harassment must be "so severe, pervasive, *and* objectively

offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added). This standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe," and harassment that has only negative effects like "a mere 'decline in grades.'" *Id.* at 652-53. When schools deviate from *Davis*, their policies cover pure speech, even speech uttered daily from a single or isolated incident. Deviating from *Davis* also means that schools cannot point to federal antidiscrimination statutes as a justification for their policies.

183. Here, the challenged policies deviate from *Davis*. None requires that the speech be "severe, pervasive, *and* objectively offensive." *Id.* at 652 (emphasis added). Nor do any of the policies require the conduct to "*den[y]* … equal access to education." *Id.* (emphasis added). That the District deviates from *Davis* shows that it intended to cover *speech*. And there is no First Amendment exception for "harassing" or "discriminatory" speech. *Saxe*, 240 F.3d at 209-10. The government "cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment'" or discrimination. *Linn Mar*, 83 F.4th at 667.

184. That the challenged policies critically deviate from the standards the Supreme Court has drawn in *Tinker* further confirms that the policies are overbroad.

185. Policies 0110 and 0110-R, for example, prohibit speech with "the purpose *or* effect of substantially or unreasonably interfering with … a student's academic performance" or "creating an intimidating, hostile or offensive … educational environment." (Emphasis added.) The purpose-or-effect language is fatal. As then-Judge Alito explained about the same phrase, policies with such language "punis[h] not only speech that actually causes disruption, but also speech that merely intends to do so": "This ignores *Tinker*'s requirement that a school

must reasonably believe that speech will cause actual, material disruption before prohibiting it." *Saxe*, 240 F.3d at 216-17. And by "focusing on the speaker's motive rather than the effect of speech on the learning environment," the policies "appea[r] to sweep in those simple acts of teasing and name-calling that" the Supreme Court has "explicitly held were insufficient for liability." *Id.* at 210-11 (cleaned up) (citing *Davis*, 526 U.S. at 633). But "even if the 'purpose' component is ignored," the policies' definition does not "necessarily ris[e] to the level of a substantial disruption under *Tinker.*" *Id.* at 217. The policies prohibit "substantially *or unreasonably* interfering" when only "*substantial* interference" may satisfy the *Tinker* standard. 393 U.S. at 511 (emphasis added). And the policies' other criterion of "creating an intimidating, hostile or offensive … educational environment" fares no better. This "'hostile environment' prong does not, on its face, require any threshold showing of severity or pervasiveness," so "it could conceivably be applied to cover any speech about [the] enumerated person-al characteristics the content of which offends someone." *Saxe*, 240 F.3d at 217. That it doesn't matter whether "the complaining individual is the … intended target" of the speech exacerbates the policies' breadth. So does the fact that the policies "emplo[y] a gestaltish 'totality of known circumstances' approach to determine whether particular speech" warrants discipline. *Cartwright*, 32 F.4th at 1125.

186.    Policies 0115, 0115-R, and 0115-E suffer from the same constitutional infirmities. These policies prohibit speech that merely "caus[e] … emotional harm to a student." But schools can't prohibit speech that "is merely offensive to some listener." *Linn Mar*, 83 F.4th at 667. There is no "generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students." *Zamecnik*, 636 F.3d at 877. Schools must "show that its

action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe*, 240 F.3d at 211. These policies do not "require any threshold showing of severity or pervasiveness," so they "could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Id.* at 217. They could bar "much 'core' political," "religious," and philosophical speech, *id.*, given that the policies make clear that a violation can be "verbal … actions" about "any characteristic." "Such speech, when it does not pose a realistic threat of substantial disruption, is within a student's First Amendment rights." *Id.*

187.    There's more. The policies proscribe speech that "has *or would have*" an effect on a student's education, so the District prohibits speech that does not affect any student. Nor do the policies require a reasonable forecast that the speech will cause substantial disorder. And like Policies 0110 and 0110-R, these policies prohibit "*unreasonable* interference," which again differs from *Tinker*'s requirement of "*substantial* interference." 393 U.S. at 511 (emphasis added).

188.    Policy 5300 has many speech restrictions; each overbroad. The restrictions prohibit speech that is merely "hostile," "derogatory," "intimidating," "abusive," "hate[ful]," "discriminat[ory]," "inflammatory," "ridiculing," or "demeaning." Again, while "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or

- 54 -

[another characteristic]." *Saxe*, 240 F.3d at 206. The District's "[l]oosely worded anti-harassment" policies are thus overbroad because they could "conceivably be applied to cover any speech … the content of which offends someone." *Id.* at 207, 217. They "sweep in … simple acts of teasing and name-calling"—on top of political, religious, and philosophical speech. *Id.* at 211, 217. Plus, these terms (*e.g.*, "abusive," "hateful," "demeaning") are "amorphous" because their "application would likely vary from one student to another" and exacerbate the restrictions' breadth. *Cartwright*, 32 F.4th at 1121. At bottom, speech that "may offend is not cause for its prohibition, but rather the reason for its protection." *Saxe*, 240 F.3d at 210. "By prohibiting disparaging speech," the policies "strik[e] at the heart of moral and political discourse," the First Amendment's "core concern." *Id.* These unbounded policies are overbroad.

189. Policies that deviate from the lines drawn by *Davis* and *Tinker* are unconstitutionally overbroad because they sweep in "a substantial amount of speech that is constitutionally protected." *Forsyth Cty.*, 505 U.S. at 130. Courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 215-16 (high-school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty*, 247 F. Supp. 2d at 701-04 (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad).

190. The challenged policies are also overbroad because they do not limit their reach to speech made on school grounds or during a school-sponsored activity. Policies 0115, 0115-R, and 0115-E, for example, cover "off school property" if the speech "create or foreseeably" "would create a risk of substantial disruption within the school environment" or "would

adversely affect the educational performance … or mental, emotional or physical well-being of any individual or group of individuals." Policies 0110 and 0110-R apply to speech "that occurs off school grounds … if there is some nexus or relationship between the conduct at issue and the district, including where off-campus conduct involving students endangers the health and/or safety of students … or adversely affects the educative process." And similarly, the Code of Conduct applies to all "[o]ff-campus conduct … if there is a nexus or relationship between the conduct at issue and the district," such as "using electronic means to convey … derogatory … comments."

191. The Supreme Court in *Mahanoy*, however, made clear that school policies prohibiting off-campus speech are constitutionally suspect. "When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Mahanoy*, 594 U.S. at 190. That is precisely the type of speech that the challenged policies prohibit and that the children of Parents A-C want to engage in. These students want to communicate their beliefs about controversial topics on a regular basis and to send materials about those topics through their personal phone, computer, and on social media. They also want to discuss these topics with other students and the Croton community both on and off campus, including during off-campus activities with no connection to any school-related activity. By regulating off-campus speech, the challenged policies sweep in "a substantial amount of speech that is constitutionally protected" and thus are unconstitutionally overbroad. *Forsyth*, 505 U.S. at 130.

192. The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT IV
## Violation of the First and Fourteenth Amendments
### (Policies 5300, 4526, 4526-R)

193.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

194.    Policy 5300 prohibits "Computer/electronic communications misuse." Such misuses include violating "the District's acceptable use policy" in Policies 4526 and 4526-R. The prohibition extends to "misuse off-campus," and includes "using such means of communication to threaten, harass, or annoy school personnel and/or other students," "sending 'hate mail,'" or "creating messages or documents of … [an] inflammatory nature."

195.    Policy 4526 prohibits students from "[c]yberbullying, hate mail, defamation, harassment of any kind, discriminatory jokes and remarks, or any communication that could reasonably be construed as racist, sexist, abusive or harassing to others," as well as "[s]upport or opposition for ballot measures, candidates and any other political activity."

196.    Policy 4526-R prohibits "[s]ending hate mail, making discriminatory remarks, and any other similar antisocial activities"; "[u]sing the Internet to harass … other people"; "[e]ngaging in use with the purpose to cause others personal humiliation or embarrassment"; and "[u]sing … abusive … language in either private or public messages." This list is non-exhaustive.

197.    Violations of these policies are punishable like other violations of the Code of Conduct or board policies. Violations can lead to loss of internet and technology privileges, suspension, or even expulsion.

198.    The policies' prohibitions on speech unrelated to political activity are viewpoint discriminatory and, in any event, do not satisfy *Tinker*. The policies prohibit, for example,

"hate mail," "discriminatory jokes and remarks," and "any communication that could reasonable be construed as racist, sexist, abusive, or harassing to others." These prohibitions are viewpoint discriminatory. *See Matal*, 582 U.S. at 243 (plurality op.). Policies that regulate offensive speech, like this one, impose "viewpoint-discriminatory restrictions." *Saxe*, 240 F.3d at 206. And these policies do not bar harassment alone; they bar harassment based on various protected classes (*e.g.*, "racist" and "sexist"). By barring speech based on some classes and not others, the District "disapprov[es] of a subset of messages it finds offensive." *Iancu*, 588 U.S. at 393. It "license[s] one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392. In short, "a [policy] disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu*, 588 U.S. at 396. These prohibitions also radically deviate from *Tinker*, as they do not require *any* interference or disorder from the speech, let alone *substantial* disruption. They also apply off-campus, clashing with *Mahanoy*, 594 U.S. at 187-94. The policies are thus overbroad too.

199.    Policy 4526's prohibition on "support or opposition for ballot measures, candidates and other political activity" is a content-based restriction on political speech—a category of expression where the First Amendment has "its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The District's email accounts and internet networks are traditional public forums for students. *See Am. Future Sys. v. Pa. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017) (explaining that the Internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech.

200.    The District allows students to send emails about many issues of public debate but not "political activity." That regulation is a classic content-based restriction without sufficient justification. For example, the policy appears to ban a student from sending an email that says "New York City congestion pricing is bad policy" or an email that says "re-elect Kathy Hochul for Governor of the State of New York because she halted New York City congestion pricing." Such sweeping restrictions are overbroad, especially when they do not require the email to cause *any* disruption, interference, or disorder at school, let alone a *substantial* disruption. *Cf., e.g.*, *Speech First, Inc. v. McCall*, Doc. 33 at 24-25, No. 1:23-cv-411 (W.D. Tex. Sept. 1, 2023) (concluding that a university's computer policy that prohibited "partisan political activities" violated the First Amendment).

201.    The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT V
## Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Policy 4526)

202.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

203.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. Rockford*, 408 U.S. 104, 108 (1972). "A governmental policy is unconstitutionally vague if it fails to 'provide adequate notice of the proscribed conduct' and lends 'itself to arbitrary enforcement.'" *Linn Mar*, 83 F.4th at 668; *see Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) ("[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement by [officials].").

204.     As to the first goal, "[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an *ad hoc* and subjective basis.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Grayned*, 408 U.S. at 108-09); *accord Linn Mar*, 83 F.4th at 669 ("Without meaningful guidance, District officials are left to determine on an 'ad hoc and subjective basis' what speech is … subject to discipline, and what speech is acceptable.").

205.     This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Linn Mar*, 83 F.4th at 668 ("[W]hen a school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'"). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

206.     Policy 4526 prohibits speech that "[s]upport or opposition for ballot measures, candidates and any other political activity." But the policy does not define "political," let alone what is "similar" to a "political activity." *See Mansky*, 585 U.S. at 16-17 (faulting a policy for

"not defin[ing] the term 'political,'" which "can be expansive"). The District provides no meaningful guidance about whether the ban applies to issue advocacy that is typically aligned with a certain political party, whether it prohibits only student government campaigning, or whether it ropes in anything someone might deem political—like New York City congestion pricing.

207. This vague standard deprives the average student of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2000); *see, e.g., Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481 (6th Cir. 2020) (concluding that a "political" restriction was unconstitutionally vague); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 316 (3d Cir. 2020); *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 201-03 (4th Cir. 2022); *Zukerman v. USPS*, 961 F.3d 431, 449-52 (D.C. Cir. 2020).

208. The District adopted the policy "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## PRAYER FOR RELIEF

PDE respectfully asks this Court to enter judgment in its favor and against Defendants and to provide the following relief:

A. A declaratory judgment that Policies 0110, 0110-R, 0115, 0115-R, 0115-E, 5300, 4526, and 4526-R—and any materially similar policy, provision, or law that applies at Croton schools—violate the First and Fourteenth Amendments;

B. A preliminary injunction barring Defendants from enforcing Policies 0110, 0110-R, 0115, 0115-R, 0115-E, 5300, 4526, 4526-R, and any materially similar policy, provision, or law that applies at Croton schools;

C. A permanent injunction barring Defendants from enforcing Policies 0110, 0110-R, 0115, 0115-R, 0115-E, 5300, 4526, 4526-R, and any materially similar policy, provision, or law that applies at Croton schools;

D. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

E. All other relief that the Court deems just and proper.

Dated: June 12, 2024

Respectfully submitted,

*s/ J. Michael Connolly*

Patrick Strawbridge*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

J. Michael Connolly*
James F. Hasson*
Thomas S. Vaseliou*†
Daniel M. Vitagliano†
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Counsel for Plaintiff*

*\*pro hac vice* forthcoming
*†Supervised by principals of the firm admitted to practice in VA*

**VERIFICATION**

I, Nicole Neily, declare as follows:

      1.      I am the President of Parents Defending Education, the plaintiff in this case.

      2.      I have reviewed this complaint.

      3.      For the allegations within my personal knowledge, I believe them all to be true.

      4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on PDE's conversations with its members, including Parents A, B, and C.

      5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 12, 2024

_____
Nicole Neily
President, Parents Defending Education