```
```

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ---------------------------------------x
 3  PARENTS DEFENDING EDUCATION,

 4                          Plaintiff,

 5                                              24 CV 4485(CS)
        -vs-
 6                                              CONFERENCE

 7  CROTON-HARMON UNION FREE SCHOOL DISTRICT,
    et al.,
 8
                            Defendants.
 9
    ---------------------------------------x
10
                                          United States Courthouse
11                                        White Plains, New York

12                                        July 11, 2024

13  Before:   THE HONORABLE CATHY SEIBEL,
                                          District Judge
14

15  APPEARANCES:

16  CONSOVOY McCARTHY, PLLC
         Attorneys for Plaintiff
17       1600 Wilson Boulevard
         Suite 700
18       Arlington, Virginia 22209
    DANIEL M. VITAGLIANO
19
    SOKOLOFF STERN, LLP
20       Attorneys for Defendants
         179 Westbury Avenue
21       Carle Place, New York 11514
    STEVEN C. STERN
22
    ALSO PRESENT:
23
    Abigail Needleman, Intern with Sokoloff Stern
24

25  *Proceedings recorded via digital recording device*
                              OFFICIAL COURT REPORTER
                   DARBY GINSBERG, RPR, RCR   (914) 390-4102
```

1            THE DEPUTY CLERK:  All rise.  Parents Defending
2 Education v. Croton-Harmon.
3            THE COURT:  Good afternoon, Mr. Vitagliano.  Am I
4 saying it right?
5            MR. VITAGLIANO:  Yes, Your Honor.
6            THE COURT:  Mr. Stern and Ms. Needleman.  Everyone can
7 have a seat.
8            I have letters, and I have questions.  The unusual
9 posture where the plaintiff wants me to deny its motion and
10 dismiss its case, and the defendant at least doesn't want me to
11 do that yet.
12           But I guess my first question is for you, Mr. Stern.
13 Why shouldn't I just do that and save you and the taxpayers the
14 trouble of litigating this case?  Unless you think the
15 plaintiffs have standing.
16           MR. STERN:  No, I don't, Your Honor.
17           So I reached out to plaintiff's counsel to ask for the
18 normal extension of time and was kind of surprised to hear the
19 response.  So we are sort of -- it was -- there are two aspects
20 to it:  One, you know, your time is up now.  So I wanted that
21 extension of time to answer; and two, we are going to ask the
22 Court -- and I didn't know exactly how that would come in, how
23 that application would be presented -- we are going to ask the
24 Court to dismiss the case.
25           Obviously, I want the Court to dismiss the case.  I

1  agree with them that they lack standing under Second Circuit
2  precedent, and I obviously disagree with them that that
3  precedent was incorrectly decided.  But I also, in looking at
4  this, it seems to me that what they are really doing is they are
5  making an application for voluntary dismissal without prejudice,
6  and that's what their papers say.  So to that extent, I haven't
7  answered yet that I don't know that I have the -- I have the
8  standing to object to that.
9           THE COURT:  It sounds like they want me to dismiss it
10 so that they have something to appeal, and that causes me to
11 turn to Mr. Vitagliano.
12          What's really going on here?  I mean, this issue is --
13 has been decided by the Circuit in the *Do No Harm* case.  At
14 first I looked at this, and I thought, well, obviously, your
15 firm doesn't think that whosever representing the plaintiffs in
16 that case is going to do a good job on the appeal, but then I
17 learned that it's your firm.  So what do you need this case for?
18 Clearly, you want to get this issue up to the Supreme Court.
19 You've got a vehicle for doing it.  What's the point of this
20 case?
21          MR. VITAGLIANO:  Your Honor, our clients, Parents
22 Defending Education, are currently suffering First Amendment
23 harms right now and under that binding precedent --
24          THE COURT:  You are going to get an answer on whether
25 they have standing or not faster through your other client than

1  through this client.  If you succeed in the *Do No Harm* case in
2  getting either the Circuit en banc or the Supreme Court to say
3  that the Second Circuit's decision is wrong, you can be here the
4  next day on behalf of anybody who's got standing at that time.
5  But there's no way this case is going to leapfrog that one.  So
6  I don't -- I don't understand the strategy.
7           MR. VITAGLIANO:  There is a Second --
8           THE COURT:  It's not necessary that I do, but it just
9  seems like the same lawyers are going to be making the same
10 arguments, and you are going to get where you want to get, which
11 is either an en banc or the Supreme Court sooner in that other
12 case.
13          MR. VITAGLIANO:  Regardless of how *Do No Harm vs.*
14 *Pfizer* is decided before the Second Circuit en banc, whether it
15 grants rehearing or not, there is still a second precedent,
16 *Aguayo vs. Richardson*, that also forecloses PBE from obtaining
17 relief.
18          THE COURT:  But wasn't that also relied on in the *Do*
19 *No Harm* case?
20          MR. VITAGLIANO:  So the -- so the panel opinion in *Do*
21 *No Harm* effectively vacated any ruling on that, and that was a
22 different issue because in *Do No Harm* it was a Section 1981
23 claim, which presented a novel application of *Aguayo*, whereas
24 here, it's a straightforward 1983 case that is squarely
25 foreclosed by *Aguayo*.

1               THE COURT:  How old a case is *Aguayo*?

2               MR. VITAGLIANO:  I believe the '70s.  It was a Judge
3      Friendly opinion.

4               THE COURT:  I don't think you are going to get
5      anywhere with an en banc on that, although, of course, in this
6      Supreme Court who knows because now decades-old precedents don't
7      mean anything.

8               But even the best-case scenario -- well, as I
9      understand it, one of the members of your organization doesn't
10     have a kid in the schools anymore, and the other two are going
11     to graduate, I infer from the argument, within a year -- oh,
12     yeah, here is *Aguayo* was in 1973.  You know, I don't see -- and
13     maybe there are other members of this organization who will
14     ripen into parents who have kids in the school.

15              The only thing I didn't understand is the complaint
16     says that the parents want to remain anonymous because if it was
17     known who they were and who their children were, they would --
18     they fear either that the School District will take it out on
19     their kids that the parents filed this lawsuit, or they just
20     don't want to -- and I guess I should say -- they don't want to
21     suffer the grief they are going to suffer from people who think
22     their positions are bigoted or whatever, and I didn't understand
23     that at all.  Because, I mean, I don't think anybody really
24     seriously thinks that a school district would punish a student
25     who hadn't done anything because of something the parents did

1  like filing a lawsuit.

2          And if the parents, what they are suing for is they
3  want their kids to have the right to express unpopular views in
4  school, then it seems inconsistent for them to say, we don't
5  want it to be known who we are because we have unpopular views.
6  In other words, we want to remain anonymous so that we don't get
7  grief for our unpopular views, but what we are suing for is our
8  desire to express our unpopular views.  So both can't be true.
9  If you want to express the views, you know what comes with that,
10 and then it seems to me you should be fine with being -- with
11 being named.

12         MR. VITAGLIANO:  I think those concerns would arise in
13 different contexts, Your Honor.  So, for example, take a class
14 discussion, a student expresses one small view on one issue
15 whereas now if their identities were disclosed through this
16 litigation, it sets forth in the declarations a whole host of
17 views that many in the School District and community may find
18 unpopular or may seek to retaliate against them for.

19         THE COURT:  Well, I don't know that it really matters
20 at this stage, but if it ever gets to the point of depositions,
21 it will be very interesting because I don't see how you really
22 reconcile, "I don't want anyone to know that I am bringing a
23 lawsuit because I am expressing unpopular views, and the purpose
24 of my lawsuit is so that I and my children can express unpopular
25 views."  But --

1            MR. STERN:  I don't know how we get to take these
2   depositions if we are never allowed to learn the identity of the
3   members of the organization.
4            THE COURT:  At the very least if we went to a PI
5   hearing, these individuals would have to take the stand and
6   explain that inconsistency.  So the one little opening I saw in
7   the plaintiff's papers was that essentially if I promised that
8   they could remain anonymous forever, they would consider telling
9   me their names, you know.  It doesn't solve anything.
10           But I think -- and you will correct me if I am wrong,
11  Mr. Vitagliano -- you are not looking to voluntarily dismiss.
12  You want me to dismiss because you want to be able to have
13  something to appeal; is that correct?
14           MR. VITAGLIANO:  That is correct.  Yes.  We are not
15  actually not seeking to voluntarily dismiss our case because we
16  are still pursuing the underlying First Amendment violations.
17  We understand we would need to overcome precedence on appeal;
18  and you know, we would only seek to litigate the First Amendment
19  issues if this case were turned on appeal or after those
20  precedents that stand in our way are no more.
21           MR. STERN:  That's not the way that it works, Your
22  Honor.  I mean, a litigant can come into court and make an
23  argument, you know, that existing precedent was wrongly decided
24  or for an extension of existing law, but to come into court and
25  say -- not say, hey, Judge, we want you to decide it this way

1  because either the precedent is distinguishable or it's wrong,
2  and look at these other circuits and, you know, Judge, go out on
3  a limb here and decide the case the way that we believe it
4  should be decided on the issue of standing.  But they actually
5  came in and said, we want it just dismissed.  That's different.
6  That's a voluntary dismissal, and they are asking for it without
7  prejudice.  So --
8           THE COURT:  Well, it would have to be without
9  prejudice because they lack standing, meaning I don't have
10 subject matter jurisdiction, meaning I can't dismiss anything
11 with prejudice, and don't I have -- apart from what they want --
12 an independent obligation to assure that I have subject matter
13 jurisdiction?  And here, I am pretty sure I don't.
14          MR. VITAGLIANO:  I agree.  We agree.
15          THE COURT:  Well, I -- you know, look, the -- whether
16 there is -- I don't think that what they've done is unethical.
17 You know, they put their cards on the table.  They are not
18 trying to trick anyone.  It does feel a little -- a little like
19 gamesmanship, but how do -- if you are the Parents Defending
20 Education, how do you tee this issue up other than how they are
21 doing it?
22          MR. STERN:  I mean, you bring, you bring a lawsuit,
23 and you argue for your position as opposed to arguing that, hey,
24 district court, you should decide against me.  I mean, that's
25 seems like a Rule 11 problem.

1            THE COURT:  These parents could not be anonymous, and
2    then they could bring this case.  That's really the answer.
3            MR. STERN:  They could bring it on their --
4    potentially on their own behalf or on their child's behalf, but
5    still they lack organizational standing under *Aguayo*.
6            THE COURT:  Well, if you are an organization, and you
7    want to challenge *Aguayo*, what other way is there for them to do
8    that except to do what they are doing here?
9            MR. STERN:  Well, again, they could do it in similar
10   fashion without saying, we want you to find against us, which is
11   what they have done here.  They should --
12           (Cross-talk)
13           THE COURT:  Maybe they are doing the right thing by
14   saying, we admit you have to find against us.  I'm not sure
15   that's a distinction with a difference.
16           But I also don't see any reason why I shouldn't grant
17   the mutual wishes of both parties:  Deny the motion and dismiss
18   the case, and then let the appellate folks duke it out.
19           MR. STERN:  Grant the motion.
20           THE COURT:  Sorry?
21           MR. STERN:  Grant the motion to dismiss the case.
22           THE COURT:  What did I say?
23           MR. STERN:  Deny.
24           THE COURT:  I didn't mean that.  And, frankly, I am
25   not even sure it's a motion.  Nobody has actually made a motion.

1  I think what I am doing actually is I am concluding I lack
2  subject matter jurisdiction, and I am dismissing without
3  prejudice.  I am denying the PI motion.  That's what I am
4  denying.  I'm not -- but I'm not granting a motion dismiss
5  because there hasn't been one.  I'm writing this down so I get
6  it right.
7           I'm denying the PI motion and dismissing the case
8  without prejudice because I lack subject matter jurisdiction.
9           MR. STERN:  On plaintiff's application.
10          THE COURT:  And I can deny -- I can deny the motion
11 even though -- the PI motion, even though I lack subject matter
12 jurisdiction.  That's what happened in *Do No Harm*, right?
13          MR. VITAGLIANO:  Correct.  Yes.  The motion for
14 preliminary injunction would be denied, and the case would need
15 to be dismissed.  That's exactly what *Pfizer* says.  Your Honor,
16 we would just wish, respectfully request that you also give us
17 the alternative ruling under *Aguayo*, so we can take that
18 precedent up on appeal as well.  It would be doing so in the
19 interest of judicial economy.  It would save resources for both
20 the parties, their attorneys, this Court, because if we were to
21 go up only on the *Do No Harm vs. Pfizer* case, regardless what
22 happens, *Aguayo* still stands in the way.  If we prevail and
23 overturn *Do No Harm vs. Pfizer*, we come back down.  *Aguayo*
24 stands in the way.  If we do not succeed in overturning *Do No*
25 *Harm vs. Pfizer*, we come back or dismissal would be without

1   prejudice.  We could then re-file, not seek a preliminary
2   injunction, and *Aguayo* still forecloses relief, which would then
3   require a whole 'nother round of appellate proceedings en banc,
4   possibly Supreme Court review.
5           If I could just add, Your Honor, counsel suggested
6   that there is a Rule 11 issue.  There is no Rule 11 issue, and I
7   know it may seem like an unusual posture, but in cases like this
8   that are brought specifically to overturn a precedent, I think
9   it's very forthcoming to just concede defeat.  The *Janus* case
10  that was before the Supreme Court a few years ago, plaintiffs
11  there conceded defeat and dismissal in response to a motion to
12  dismiss, and I would also direct Your Honor to the *County of*
13  *Westchester* case, which we cite in our briefing that was before
14  Judge Halpern.  The plaintiff there challenged a Westchester
15  County ordinance, conceded defeat under Supreme Court precedent
16  in the complaint.  The County then filed a pre-motion letter to
17  move to dismiss, and the plaintiff conceded in response to the
18  pre-motion letter that we agree we lose.  You can dispense with
19  formal briefing, and that's exactly what Judge Halpern did, and
20  he dismissed it under the binding Supreme Court precedent.
21          THE COURT:  I mean, I am expressing no opinion about
22  Rule 11.  I don't have a motion in front of me, and I don't see
23  a need to go down that road.  As I said, I don't think
24  plaintiff's counsel has hidden the ball in any way.
25          I mean, look, it looks to me like I lack subject

1  matter jurisdiction under either *Do No Harm vs. Pfizer* or *Aguayo*
2  *vs. Richardson* because the former says an association has to
3  identify at least one injured member to establish standing, and
4  plaintiff has not done that.  And *Aguayo* says that organizations
5  can't bring 1983 suits on behalf of their members, and that's
6  what they are trying to do.  So there's two reasons I lack
7  standing -- not I lack standing, plaintiffs lack standing.  Why
8  I lack subject matter jurisdiction.
9           What the higher courts want to do with that, I will
10 leave to them.  I am still not really getting how -- how this is
11 going to get resolved in time for parents A and B, who I think
12 said it's -- maybe I am wrong, but I thought their children were
13 going to be seniors.  But should either or both of those
14 precedents be overturned and should there be members of
15 plaintiff's organization at that time who want to pursue this
16 issue, and should those people have standing, then we will
17 revisit.
18          Just out of curiosity, you mentioned, Mr. Stern, that
19 the schools' policies basically, at least in large part, track
20 what the State requires.
21          MR. STERN:  That's DASA.  I haven't done a complete
22 side-by-side yet, but that's my understanding they largely track
23 DASA.
24          THE COURT:  So is your beef -- your client's beef
25 really with School District or is it with the State of New York

1  that requires school districts to have policies like the one you
2  are challenging?
3            MR. VITAGLIANO:  It's with the School District
4  directly.  As my friend on the other side, I haven't done the
5  side-by-side comparison, just we know that our client's members,
6  their children are currently in public schools, and they are
7  currently suffering First Amendment harms because of Croton's
8  policies.
9            THE COURT:  I also noticed it looked like a lot of the
10 "brave horribles" in your complaint were from schools around the
11 country.  Did you have anything in here about how this District
12 is enforcing those policies?  And I understand you are arguing
13 that just the existence of the policies is chilling your
14 clients' speech, but there was some discussion about ways in
15 which some schools have enforced their policies that you
16 obviously wanted to be part of your case.
17           MR. VITAGLIANO:  Just a broader issue around the
18 country, and Parents Defending Education has litigated cases
19 like this around the country against similar speech policies and
20 has been very successful.
21           I direct Your Honor to the *Linn Mar* case that we cite
22 in our briefing, as well as the *Olentangy* case that we cite in
23 our briefing.
24           THE COURT:  Was there anything in your complaint about
25 Croton-Harmon and how they are enforcing their policies?

1           MR. VITAGLIANO:  As to specific instances of
2  enforcement, I am not sure, but that's not required for pre-
3  enforcement standing.
4           THE COURT:  I understand.  I was --
5           MR. STERN:  I don't believe there is, Judge, reading
6  through the complaint.  And there is also a lot of information
7  in the -- extraneous information about the complaint about, you
8  know, certain political issues and political beliefs that don't
9  seem to be implicated in any way by the School District's
10 policies one way or another.
11          THE COURT:  Well, it sounded like the parents -- and
12 maybe their children have -- and I don't know if this is just
13 hypothetical or real -- but if they had a trans teacher who
14 wanted to be called "Mr", but the plaintiffs thought there is no
15 such thing and therefore, they wanted to call that teacher "Ms"
16 or "Miss" or "Mrs" and not use the person's preferred honorific,
17 that that would be a violation of their First Amendment rights.
18 I don't know if that's real or made up, and I don't know why
19 it's a big deal, frankly, but it's not my -- it's not my opinion
20 that matters.
21          You know, if your kid -- let's say there was a teacher
22 who was married but wanted to be called "Ms", and the kids
23 insisted on calling her "Mrs" for whatever reason, not using
24 their preferred -- the teacher's preferred term, aside from it
25 just being sort of gratuitously disrespectful, would it run

1  afoul of any of the rules?

2           Is it your clients' position, Mr. Vitagliano, that it
3  would?

4           MR. VITAGLIANO:  It may because a lot of the policies
5  turn on the subjective perception of the listener, and if it
6  causes them offense, then the student very well could be
7  punished.

8           And I would just add, Your Honor, as we explained in
9  the supplemental declaration, the School District doubled down
10 on all of its policies in response to the complaint.  They
11 issued a public statement that it prides itself on not
12 permitting this type of unfavored or unpopular speech.  So I
13 think it's quite clear that it intends to enforce its policies,
14 and it does see an issue with what's outlined in the complaints
15 and the members' declarations.

16          MR. STERN:  Your Honor, if I may, I mean, one of the
17 rules of the School District is to promote dignity and respect
18 and teach that in the educational environment, and that's all
19 these policies are designed to do.  Yes, they track state law,
20 which is encouraging school districts in this state to promote
21 dignity and respect for others, and I think that's what we
22 should be teaching our children.  That said, obviously, we are
23 dealing with a First Amendment legal issue, but --

24          THE COURT:  And I don't read what the School District
25 said as saying, we want to punish unpopular speech, but I

1  understand why Mr. Vitagliano and his clients are interpreting
2  it that way.
3      You know, if I decided today that I didn't want to
4  call you Mr. Stern and Mr. Vitagliano, I wanted to call you
5  Ms. Stern and Ms. Vitagliano, you wouldn't like it very much,
6  but I guess, Mr. Vitagliano, you would say it's my right to do
7  that.
8      MR. VITAGLIANO:  Your Honor's courtroom.
9      THE COURT:  Well, look, I don't have subject matter
10 jurisdiction, so now we are just having an intellectual
11 discussion.
12      I'm denying the motion for a preliminary injunction,
13 and I am dismissing the case without prejudice for lack of
14 subject matter jurisdiction pursuant to *Do No Harm vs. Pfizer*,
15 96 F.4th 106, and *Aguayo v. Richardson,* 473 F.2d 1090.  I will
16 do a short order saying that, and then you folks can go up to
17 the Second Circuit.  Thank you both.
18      MR. VITAGLIANO:  Thank you, Your Honor.
19      MR. STERN:  Thank you, Your Honor.
20                         -o0o-
21
22
23     Certified to be a true and accurate transcript of the
   digital electronic recording to the best of my ability.
24     /s/ Darby Ginsberg
       U.S. District Court
25     Official Court Reporter